IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Thomas Christopher Stevens, | ) | C/A No.: 1:15-2823-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On January 25, 2013, Plaintiff protectively filed an application for DIB in which he alleged his disability began on March 10, 2011. Tr. at 85, 176–77. His application was denied initially and upon reconsideration. Tr. at 98–101, 102–06. On September 17,

2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Jane A. Crawford. Tr. at 31–75 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 26, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 7–10. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 17, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 35. He completed high school. *Id.* His past relevant work ("PRW") was as a truck loader. Tr. at 63. He alleges he has been unable to work since March 10, 2011. Tr. at 176.

2.    Medical History

Plaintiff presented to cardiologist Vipul B. Shah, M.D. ("Dr. Shah"), on September 9, 2010, with a complaint of substernal chest discomfort. Tr. at 403. Dr. Shah indicated Plaintiff's symptoms were equivocal for angina, that electrocardiogram ("EKG") changes were noted, and that Plaintiff had a history of lateral defect. Tr. at 404. He ordered a myocardial perfusion study ("MPS") with Bruce protocol, counseled Plaintiff on smoking cessation and a low-salt diet, and recommended a follow up visit in four months. *Id.* Plaintiff reported improvement in his chest pain during a follow up visit with Dr. Shah on January 17, 2011. Tr. at 402. Dr. Shah indicated a recent stress test showed no significant ischemia. *Id.*

2

On February 18, 2011, magnetic resonance imaging ("MRI") of Plaintiff's right shoulder indicated thickening and edema of the supraspinatus tendon; likely medial subluxation of the biceps tendon; and acromioclavicular ("AC") hypertrophic changes. Tr. at 441. Radiologist Perry Edenfield, M.D., indicated Plaintiff had a possible tendon tear. *Id.*

On March 16, 2011, Plaintiff underwent surgery to treat a right rotator cuff tear, biceps tendon rupture, and degenerative tears of the superior, anterior, and posterior glenoid labrum. Tr. at 433–35. Ronald Singer, M.D. ("Dr. Singer"), performed right shoulder arthroscopy with arthroscopic subacromial decompression; arthroscopic distal clavicle resection; arthroscopic debridement of the superior, anterior, and posterior glenoid labrum; arthroscopic biceps tenodesis; and debridement of a partial-thickness rotator cuff tear. *Id.*

On June 30, 2011, Plaintiff complained of intermittent right-sided chest discomfort that began two to three weeks earlier. Tr. at 397. Dr. Shah stated Plaintiff's chest discomfort suggested a gastrointestinal origin and recommended medication for acid reflux. Tr. at 398.

On August 10, 2011, an MRI arthrogram of Plaintiff's right shoulder showed prominent partial-thickness tearing and severe focal thinning of the supraspinatus tendon. Tr. at 438.

Plaintiff denied chest pain during a follow up visit with Dr. Shah on August 25, 2011. Tr. at 395–96.

On September 30, 2011, Dr. Singer performed right shoulder arthroscopy with arthroscopic rotator cuff repair, revision subacromial decompression, and debridement of the superior glenoid labrum and posterior glenoid labrum with lysis of adhesions in the subacromial space. Tr. at 430–32.

Plaintiff followed up with Dr. Shah November 28, 2011, with a complaint of intermittent chest discomfort that began 10 days earlier. Tr. at 393. He indicated the discomfort was on the right side of his chest and was worsened by movement. *Id.* Dr. Shah noted Plaintiff's symptoms were atypical for angina. Tr. at 394. He indicated he would continue to monitor Plaintiff closely and that he may consider left heart catheterization if Plaintiff's chest pain continued. *Id.*

Plaintiff followed up with Dr. Shah on December 12, 2011, and reported chest discomfort that radiated from his substernal area to his shoulders. Tr. at 391. He denied orthopnea, dyspnea, edema, palpitations, syncope, near syncope, claudication, or stroke-like symptoms. *Id.* Dr. Shah ordered an MPS and instructed Plaintiff to follow up in two months. Tr. at 392.

On January 9, 2012, Plaintiff reported to Dr. Singer that he had experienced increased pain in his right shoulder since he "felt a pop" while lifting weights during physical therapy. Tr. at 310. Dr. Singer indicated the x-ray showed no abnormality and recommended Plaintiff undergo an MRI arthrogram. *Id.*

On January 23, 2012, Plaintiff followed up with Dr. Singer regarding the MRI arthrogram. Tr. at 306. Dr. Singer indicated Plaintiff had a small recurrent tear in the right supraspinatus and recommended revision rotator cuff repair. *Id.* He indicated

Plaintiff would likely require four to six months of recovery time, but should be able to perform one-handed work within six to eight weeks of surgery. *Id.*

Plaintiff followed up with Dr. Shah on January 30, 2012. Tr. at 389. He denied chest discomfort suggestive of ischemia, orthopnea, dyspnea, edema, palpitations, syncope and near syncope. *Id.* Dr. Shah indicated Plaintiff's chest pain had resolved and stated it was possibly musculoskeletal shoulder pain. Tr. at 390. He directed Plaintiff to continue his current medical therapy for hypertension, palpitations, and chest pain. *Id.*

On February 17, 2012, Dr. Singer performed the following surgical procedures: right shoulder arthroscopy with revision rotator cuff repair, arthroscopic subacromial decompression, arthroscopic glenohumeral synovectomy, arthroscopic debridement of superior labrum, and arthroscopic debridement of adhesions. Tr. at 317.

Plaintiff presented to Robert Raspa, PA-C ("Mr. Raspa"), for a post-operative visit on February 24, 2012. Tr. at 304. He reported that he had been in pain since his surgery. *Id.* Mr. Raspa noted Plaintiff's incisions were healing and his sutures were in place. *Id.* He indicated Plaintiff had mild generalized swelling around the surgical site. *Id.* He instructed Plaintiff to keep his right arm in the sling without motion for four weeks. *Id.*

Plaintiff followed up with Mr. Raspa on April 11, 2012, and complained of discomfort. Tr. at 302. Mr. Raspa noted that Plaintiff was wearing his sling, but was "actively abducting and externally rotating to tell me the motions that hurt him, although he is not supposed to be performing any active range of motion." *Id.* Mr. Raspa instructed Plaintiff to avoid active range of motion ("AROM") and to begin physical therapy with passive range of motion ("PROM"). *Id.*

On April 18, 2012, Plaintiff complained to Mr. Raspa of increased pain that was not adequately relieved by Hydrocodone. Tr. at 300. Mr. Raspa observed Plaintiff to have well-healed incisions with no evidence of infection or swelling. *Id.* He indicated Plaintiff could flex to 120 degrees passively; could abduct to 90 degrees; could rotate internally to his knee; and could rotate externally to approximately 15 degrees. *Id.* He prescribed Percocet and recommended Plaintiff use ice and anti-inflammatory medications and follow up in four weeks. *Id.*

Plaintiff reported worsened symptoms on April 30, 2012. Tr. at 297. He indicated his pain was constant, aching, and throbbing and rated it as a 10 on a 10-point scale, with 10 indicating the most severe level of pain. *Id.* Dr. Singer observed mild tenderness in Plaintiff's right AC joint and proximal biceps tendon. *Id.* He noted mild impingement findings and 4+/5 supraspinatus strength in Plaintiff's right shoulder. *Id.* He indicated Plaintiff's passive forward elevation was limited to 170 degrees and that he had mild glenohumeral crepitus during range of motion ("ROM") testing. *Id.* Dr. Singer prescribed Oxycodone and physical therapy and recommended that Plaintiff remain out of work and follow up in six weeks. Tr. at 298.

On June 21, 2012, Plaintiff reported to Dr. Singer that his symptoms had worsened. Tr. at 295. He rated his pain as a 10. *Id.* Plaintiff complained of posterior neck pain with extremes of rotation. *Id.* Dr. Singer observed Plaintiff's proximal biceps tendon to be moderately tender and indicated mild impingement findings in his right shoulder. *Id.* Plaintiff's supraspinatus strength was 4+/5. *Id.* Passive forward elevation of his right shoulder was limited to 170 degrees. *Id.* Plaintiff had no evidence of shoulder instability

and showed no other abnormalities on examination. *Id.* Dr. Singer indicated Plaintiff's pain seemed "out of proportion to clinical findings" and stated he worried "somewhat about motivation to RTW.[1]" Tr. at 295, 296. He recommended Plaintiff continue in physical therapy, engage in no heavy lifting, and wear a sling at all times that he was not in physical therapy. Tr. at 295.

Plaintiff followed up with Dr. Shah on July 23, 2012, and denied chest discomfort suggestive of ischemia, orthopnea, dyspnea, edema, palpitations, syncope, or near syncope. Tr. at 387. Dr. Shah indicated that Plaintiff's hypertension and palpitations were stable and adequately controlled on his medications. Tr. at 388. He stated Plaintiff's chest pain was resolved and that a recent stress test showed no significant ischemia. *Id.*

Plaintiff followed up with Mr. Raspa on July 26, 2012. Tr. at 293. He continued to complain of right shoulder discomfort that he rated as a 10. *Id.* He indicated he was taking Oxycodone every four to six hours for pain. *Id.* Mr. Raspa observed Plaintiff to have well-healed incisions; no swelling; full ROM in all planes with complaints of pain above shoulder height for forward flexion and abduction; good cuff strength; and to be distally neurovascularly intact. *Id.* He ordered Plaintiff to engage in four weeks of work-hardening physical therapy and undergo a functional capacity evaluation. *Id.*

Plaintiff presented to Southern States Spine and Muscle Rehabilitation Center for an initial physical therapy evaluation on August 8, 2012. Tr. at 268–70. He complained of continued pain in his right shoulder and an inability to lift his daughter. Tr. at 268. Plaintiff's right shoulder flexion was reduced to 145 degrees with AROM and 158

---

[1] "RTW" means "return to work."

degrees with PROM.[2] *Id.* Manual muscle testing ("MMT") revealed Plaintiff to have 4/5 right shoulder strength with flexion. *Id.* His right shoulder abduction was to 104 degrees with AROM and 155 degrees with PROM.[3] *Id.* MMT showed 4-/5 right shoulder strength with abduction and 4/5 strength with extension. *Id.* Plaintiff had reduced external rotation of his right shoulder to 78 degrees on AROM and 85 degrees on PROM.[4] *Id.* He demonstrated reduced internal rotation of his right shoulder to 51 degrees on AROM and 57 degrees on PROM. *Id.* MMT indicated 4-/5 right shoulder strength with internal and external rotation. *Id.* Hawkins, Speed's, and Empty Can tests were all positive on the right and negative on the left. *Id.* Plaintiff had a protracted and elevated right shoulder. *Id.* Dr. Singer approved three physical therapy visits per week for four weeks. Tr. at 270.

On August 29, 2012, Plaintiff reported increased right shoulder pain that he quantified as a 10. Tr. at 290. He described his pain as constant and throbbing and indicated it was associated with swelling. *Id.* Dr. Singer observed Plaintiff to have mild tenderness in his AC joint and proximal biceps tendon. *Id.* Plaintiff's supraspinatus strength was 5-/5. *Id.* The physical examination was otherwise unremarkable. *Id.* Dr. Singer indicated Plaintiff's subjective complaints seemed to be out of proportion to the objective findings. Tr. at 291. He specified that Plaintiff "[t]alks comfortably during the evaluation with constant arm and shoulder gestures without pain when distracted. Suspect that his recovery period will be extended." *Id.*

---

[2] Plaintiff's left shoulder flexion was normal at 180 degrees with AROM and PROM. Tr. at 268.

[3] Plaintiff's left shoulder abduction was normal at 180 degrees with AROM and PROM. Tr. at 268.

[4] Plaintiff's left shoulder external and internal rotation was normal at 90 degrees. *Id.*

Plaintiff participated in a functional capacity evaluation on September 12, 2012. Tr. at 271–82. The results of testing suggested Plaintiff could perform work at the sedentary exertional level. Tr. at 271. Plaintiff demonstrated the ability to occasionally lift up to 15 pounds; to lift 10 pounds from floor to waist; to carry up to 10 pounds from waist to shoulder; to push 18 pounds; and to pull nine pounds. *Id.* Physical therapist Brittany L. Hunt indicated Plaintiff demonstrated inconsistent performance with testing, which was determined based on his physiological responses and inconsistent movement and muscle recruitment patterns between when he was aware of being observed and unaware of being observed. *Id.* She stated she considered the capabilities specified to be Plaintiff's minimal functional ability level. *Id.* She observed Plaintiff to meet job functions with respect to sitting, standing, walking, and balancing. Tr. at 272. She indicated Plaintiff did not meet job functions with regard to reaching at desk level, reaching at shoulder level, reaching at floor level, stooping, crouching, and reaching overhead. *Id.* She stated Plaintiff engaged in self-limiting behavior with respect to floor-to-waist lifting, waist-to-shoulder lifting, floor-to-shoulder lifting, bimanual carrying, pushing, pulling, climbing stairs, and climbing ladders. *Id.* Plaintiff performed inconsistently on manual voluntary effort, pinch strength testing, and isometric push/pull and engaged in self-limiting behavior on the dynamic lift test. *Id.*

On September 27, 2012, Plaintiff reported to Dr. Singer that his symptoms had worsened as a result of "work conditioning." Tr. at 287. Dr. Singer noted the following abnormal findings: flexibility of the cervical spine limited at the extremes by pain; tenderness over the right trapezius; mild tenderness in the proximal biceps tendon of the

right shoulder; mild impingement findings in the right shoulder; 5-/5 supraspinatus strength in the right shoulder; positive forward elevation of the right shoulder limited to 170 degrees; and mild glenohumeral crepitus on ROM testing. *Id.* He administered a right trapezial trigger point injection. Tr. at 288. He stated Plaintiff had reached maximum medical improvement and indicated Plaintiff had 20% impairment to his right shoulder under the American Medical Association's Guidelines. Tr. at 175, 287. He indicated Plaintiff was able to return immediately to work that did not require he lift over 25 pounds or engage in repetitive overhead work. Tr. at 288. He stated Plaintiff would not need future medical care related to his injury. Tr. at 175.

On October 8, 2012, Plaintiff complained of swelling in his right upper arm and forearm following a two-mile walk. Tr. at 284. He described his pain as constant, stabbing, and throbbing and rated it as a 10. *Id.* Dr. Singer observed Plaintiff to have moderate swelling in the right upper arm and forearm. *Id.* He indicated he saw no physical exam changes since the last exam, but would schedule a Doppler scan of Plaintiff's right upper extremity to rule out deep venous thrombosis ("DVT"). Tr. at 285. The venous exam with duplex Doppler revealed no evidence of DVT. Tr. at 315.

On December 27, 2012, Plaintiff presented to Sudesh Kedar, M.D. ("Dr. Kedar"), at Carolina Urgent and Family Care with a complaint of swelling in his right shoulder. Tr. at 332. Dr. Kedar noted tenderness to palpation and refilled Plaintiff's prescription for Percocet. *Id.* Plaintiff also followed up with Dr. Shah on December 27, 2012. Tr. at 385. He denied chest discomfort suggestive of ischemia, orthopnea, dyspnea, edema,

palpitations, syncope, or near syncope. *Id.* Dr. Shah indicated Plaintiff's hypertension and palpitations were adequately controlled on his current medications. Tr. at 386.

Plaintiff complained of right shoulder pain to Dr. Kedar on January 25, 2013. Tr. at 330. Dr. Kedar observed Plaintiff to have decreased ROM and tenderness to palpation. *Id.* Plaintiff requested and received a refill of Percocet. *Id.*

On February 28, 2013, Dr. Kedar indicated Plaintiff's hypertension was controlled on Metaprolol. Tr. at 327. He refilled Plaintiff's prescription for Percocet and instructed him to follow up with the orthopedist. *Id.*

On March 29, 2013, Plaintiff followed up with Dr. Kedar regarding right shoulder pain. Tr. at 323. Dr. Kedar noted tenderness, but indicated Plaintiff had normal ROM and stability. *Id.* He refilled Plaintiff's prescription for Percocet. *Id.*

Plaintiff followed up with Dr. Singer on April 29, 2013. Tr. at 355. He complained of worsened shoulder pain that necessitated use of Percocet three times daily. *Id.* Dr. Singer observed Plaintiff to have moderate midline and pericervical spinal tenderness from C1 to T1. *Id.* He indicated Plaintiff's cervical rotation was limited to 75% of normal. *Id.* Plaintiff's cervical strength was within normal limits and his sensation was intact in all upper extremity dermatomes. *Id.* Dr. Singer indicated Plaintiff's right shoulder showed no atrophy and had intact sensation to light touch. *Id.* Plaintiff's proximal biceps tendon was mildly tender and he had mild impingement findings in his right shoulder. *Id.* His passive forward elevation was limited to 170 degrees. *Id.* Dr. Singer stated Plaintiff's symptoms were the result of early osteoarthritis in his right shoulder. Tr. at 356. He indicated Plaintiff would be unlikely to benefit from additional

surgery. *Id.* He continued to endorse work restrictions of lifting no more than 25 pounds and no repetitive overhead work. *Id.* He also noted that Plaintiff had some cervical spondylosis at C5-6 and C6-7, but had no evidence of cervical radiculopathy. *Id.*

On May 15, 2013, Plaintiff reported to Dr. Shah that he had experienced no chest discomfort suggestive of ischemia, orthopnea, dyspnea, edema, palpitations, syncope, or near syncope. Tr. at 383. Dr. Shah indicated Plaintiff's hypertension was reasonably well-controlled and that his chest pain was resolved. Tr. at 384.

On May 24, 2013, state agency medical consultant Hugh Clarke, M.D., reviewed the record and indicated Plaintiff had the following physical residual functional capacity ("RFC"): occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; limited pushing and pulling with the right upper extremity; frequent climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; occasional reaching with the right upper extremity, crawling, and climbing of ladders, ropes, and scaffolds. Tr. at 79–81. State agency medical consultant Lina B. Caldwell, M.D., assessed a similar physical RFC on August 16, 2013, but specified that Plaintiff could perform occasional pulling and occasional lateral and overhead reaching with his right upper extremity. Tr. at 90–92.

Plaintiff underwent MR ("magnetic resonance") arthrogram of the right shoulder on June 12, 2013, that indicated a recurrent full thickness tear of the peripheral rotator cuff with mild retraction. Tr. at 359. Plaintiff subsequently followed up with Dr. Singer on June 20, 2012. Tr. at 361. Dr. Singer observed Plaintiff to have moderate midline and

pericervical tenderness from C3 to T1; a moderately tender right biceps tendon; mild impingement findings in his right shoulder; and 5-/5 supraspinatus strength in his right shoulder. *Id.* He assessed a complete tear of the right rotator cuff tendon and indicated he would refer Plaintiff to Scott O'Neal, M.D., for a second opinion regarding surgical options. Tr. at 361–62. He stated he was "truly concerned about postoperative compliance" and was "incredulous that this patient has recurrent tear, particularly in the absence of non-compliance." Tr. at 362.

On October 4, 2013, Plaintiff reported to Dr. Shah that he had experienced no chest discomfort suggestive of ischemia, orthopnea, dyspnea, edema, palpitations, syncope, or near syncope. Tr. at 381. Dr. Shah indicated Plaintiff's hypertension was reasonably well-controlled and that a recent stress test showed no significant ischemia. Tr. at 382.

On July 28, 2014, Plaintiff reported to Dr. Singer that his right shoulder pain had worsened. Tr. at 408. He indicated his pain was accompanied by swelling and numbness. *Id.* Dr. Singer noted no abnormalities in Plaintiff's cervical spine. *Id.* He observed mild tenderness in Plaintiff's right AC joint and proximal biceps tendon. *Id.* Plaintiff had mild impingement findings and 4/5 supraspinatus strength. *Id.* His passive forward elevation was limited to 165 degrees and he demonstrated moderate glenohumeral crepitus during ROM testing. *Id.* Shoulder stability testing was consistent with multidirectional instability. *Id.* Dr. Singer stated that Plaintiff's permanent restrictions included  limited use of his right arm with no repetitive overhead activities, no lifting more than five to 10

pounds occasionally with his right arm at his side, and no significant pushing or pulling. Tr. at 409.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on September 17, 2014, Plaintiff testified that he last worked in March 2011. Tr. at 36. He indicated he had collected weekly workers' compensation benefits since that time. Tr. at 37.

Plaintiff testified that he stopped working because he tore his right rotator cuff. Tr. at 38. He indicated he underwent three surgeries to his shoulder over an 11-month period. *Id.* He stated he was right-handed, but had been using his left hand since his surgeries. Tr. at 48.

The ALJ questioned Plaintiff about an indication from Dr. Singer on September 30, 2012, that he could return to work with a 25-pound lifting restriction. Tr. at 41. Plaintiff stated his employer would not allow him to return to work with the limitations set forth by Dr. Singer. *Id.* The ALJ asked if he could have performed another job that required he lift less weight. Tr. at 42. Plaintiff indicated he applied for other jobs and stated that he could have worked in a desk job that required he lift less than 25 pounds. Tr. at 43–44. He stated he had not subsequently returned to work because an MRI in June 2013 showed he needed additional surgery. Tr. at 44.

Plaintiff testified he had experienced chest pain and increased blood pressure since undergoing surgeries. Tr. at 49. He stated the chest pain occurred every other day and that

his cardiologist indicated it had resulted from his surgeries. Tr. at 49, 51. He endorsed pain in his neck and back, as well as headaches. Tr. at 52. He indicated he no longer thought he was capable of performing a desk job because of his pain. Tr. at 55.

Plaintiff testified that he lived with his wife and four-year-old daughter. Tr. at 45. He stated his wife worked during the day. *Id.* He indicated that he stayed home with his daughter, but that she had recently started attending preschool three days per week. *Id.* He stated he typically took a walk and would lie around and watch television during the day. Tr. at 46–47. He stated he spent most of a typical day lying down. Tr. at 50. He indicated his wife helped him to shower. Tr. at 47. He stated he had enjoyed gardening before his injury, but that he was no longer able to perform yard work. Tr. at 48. He stated his brother cut his grass and his wife shopped for groceries, cooked, cleaned, and did laundry. *Id.* He indicated he drove to visit his mother once a week and to church each Sunday, but denied driving his daughter to and from school. Tr. at 49. He stated he had experienced difficulty sleeping since his injury in March 2011. Tr. at 53.

Plaintiff testified that he was no longer prescribed pain medications or muscle relaxers. Tr. at 46. He indicated he took Aleve for pain. *Id.* He indicated he was better able to function during the time that his medications were being prescribed and that he often played outside with his daughter during that period. Tr. at 47. He initially denied side effects from his medications, but later stated that the pain medication and muscle relaxer caused him to sleep all the time. *Id.* He endorsed impaired concentration as a result of his pain. Tr. at 54.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Jr., reviewed the record and testified at the hearing. Tr. at 59–74. The VE categorized Plaintiff's PRW as a truck loader, which is described in the *Dictionary of Occupational Titles* ("*DOT*") as requiring a heavy level of exertion and having a specific vocational preparation ("SVP") of three. Tr. at 63. He indicated Plaintiff described the job as ranging from medium to very heavy as performed. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could sit for at least six hours out of an eight-hour workday; could stand and walk for at least six hours out of an eight-hour workday; could lift up to 15 pounds occasionally; could climb ramps and stairs occasionally; could not climb ladders, ropes, or scaffolds; could not work at unprotected heights or around dangerous machinery; could frequently reach, handle, and finger with the right (dominant) upper extremity; and could reach overhead occasionally with the right upper extremity. Tr. at 64. The VE testified that the hypothetical individual could perform a full range of sedentary, unskilled work activity. *Id.* The ALJ asked the VE to identify examples of jobs that would accommodate the limitations in the hypothetical question. *Id.* The VE identified sedentary work with an SVP of two as a machine tender, *DOT* number 731.685-014, with approximately 7,000 positions in the local economy and 275,000 positions in the national economy. Tr. at 65. The ALJ asked if the individual would be able to perform a full range of sedentary work with the manipulative limitations indicated in the hypothetical question. *Id.* The VE indicated he would. *Id.*

16

The ALJ next asked the VE to assume the hypothetical individual had the same limitations indicated in the first hypothetical question, but to further assume the individual could only occasionally lift and carry five to 10 pounds with the right upper extremity. *Id.* He asked if the individual could perform any jobs. *Id.* The VE indicated his answer did not change with the additional limitation. Tr. at 66. He confirmed that the individual could perform the full range of sedentary work. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual would be off task due to pain for 20 percent of the workday. *Id.* He asked if the individual could perform any work. *Id.* The VE testified that he could not because his time off task would exceed normal break time. *Id.*

Plaintiff's attorney asked the VE to assume the individual would miss work at least one day per week. *Id.* The VE indicated that missing one day of work per week would be considered excessive absenteeism and would not be consistent with gainful employment. *Id.*

The VE testified that his testimony was consistent with the *DOT*, with the exception of the information regarding overhead reaching. Tr. at 72. He explained that the *DOT* did not distinguish between overhead reaching and reaching in other directions and that his testimony was based on his experience. *Id.*

2.    The ALJ's Findings

In his decision dated February 26, 2015, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.  The claimant has not engaged in substantial gainful activity since March 10, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: status post-rotator cuff repair of the right shoulder; status post-rotator cuff repair revision; cervical spondylosis; and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except the claimant could occasionally lift and carry five to ten pounds with the right dominant upper extremity. The claimant can occasionally climb ramps and stairs, cannot climb ladder[s], ropes, or scaffolds, and cannot work at unprotected heights or around dangerous machinery. The claimant can frequently reach, handle, and finger with the right dominant extremity and can occasionally reach overhead with the right dominant upper extremity.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on June 11, 1965 and was 45 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 10, 2011, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 20–26.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly evaluate Plaintiff's ability to perform other work at step five; and

2)    the ALJ did not explain his findings regarding Plaintiff's RFC in accordance with the provisions of SSR 96-8p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Step Five Determination

Plaintiff argues the ALJ erred in relying on the medical-vocational guidelines[7] to support a decision to deny his claim for benefits. [ECF No. 21 at 15]. He maintains that the medical-vocational guidelines were inapplicable because he had nonexertional impairments. *Id.* He contends the ALJ further erred by relying on vocational testimony that was "clearly erroneous" regarding the impact of his nonexertional impairments on the sedentary occupational base. *Id.* He maintains the VE's testimony conflicted with the description of sedentary work in the *DOT* and that the VE neglected to reveal the conflict. *Id.* at 18–19. Finally, he argues that, although he had not yet attained the age of 50, it would have been more appropriate for the ALJ to apply the medical-vocational rule that directed a finding that he was disabled at age 50. *Id.* at 19–21.

[7] The medical-vocational guidelines are also referred to as the "grids" or "grid rules."

The Commissioner argues the VE appropriately identified conflicts between his testimony and the *DOT*. [ECF No. 23 at 13]. She maintains the VE identified the specific job of "machine tender" as a job an individual with Plaintiff's limitations could perform, and that the *DOT* specified that the job only required frequent handling and reaching and occasional fingering. *Id.* at 14–15. She contends the ALJ was not required to apply the medical-vocational rule that would have directed a finding that Plaintiff was disabled because the decision was rendered 105 days before his fiftieth birthday and was, thus, not a borderline age case. *Id.* at 16.

The Commissioner's burden to prove that a claimant can perform work that exists in significant numbers in the economy is triggered after the claimant establishes that he cannot perform his PRW. *Sawyer v. Colvin*, 995 F. Supp. 2d 496, 507 (D.S.C. 2014). In the fifth step of the sequential evaluation process, the ALJ must consider the individual's RFC in combination with his age, education, and work experience. SSR 83-10. The medical-vocational guidelines direct findings of "disabled" or "not disabled" based on the claimant's maximum sustained work capability (sedentary, light, medium, heavy, or very heavy), age, education, and work experience. *Id.*

"Each grid considers only the strength or exertional component[8] of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). If a claimant cannot be found disabled based on his strength limitations alone, the medical-vocational guidelines

---

[8] Exertional limitations affect the individual's ability to perform primary strength activities, which include sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 83-10.

are the starting point to evaluate his functional abilities. SSR 83-14. The medical-vocational guidelines do not consider nonexertional limitations,[9] but may be applied where the claimant's combination of exertional and nonexertional limitations allow for performance of all or substantially all unskilled jobs at a particular exertional level.[10] SSR 83-10. Thus, if a claimant has nonexertional limitations, the grid rules may be used as a framework for decision making as long as the claimant's nonexertional impairments do not substantially reduce the range of work within the exertional level. SSR 83-14 ("A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform. The person, therefore, comes very close to meeting a table rule which directs a conclusion of 'Not disabled.' On the other hand, an additional exertional or nonexertional limitation may substantially reduce a range of work to the extent that an individual is very close to meeting a table rule which directs a conclusion of 'Disabled.'"); *see also* 20 C.F.R. § 404.1569a(d) (stating when an individual has a combination of exertional and nonexertional limitations, "we will not

---

[9] Nonexertional limitations are limitations of function that affect the individual's ability to perform activities that involve the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use the fingers for fine activities. SSR 83-10.

[10] The SSR offers the following example of a situation in which the sedentary grid rule may be used as a framework for decision making, even though the individual has a nonexertional limitation: "Where a person can perform all of the requirements of sedentary work except, for example, a restriction to avoid frequent contact with petroleum based solvents, there is an insignificant compromise of the full range of sedentary work. Technically, because of the restriction, this person cannot perform the full range of sedentary work. However, this slight compromise within the full range of sedentary work (i.e., eliminating only the very few sedentary jobs in which frequent exposure to petroleum based solvents would be required) leaves the sedentary occupational base substantially intact. Using the rules as a framework, a finding of 'Not disabled' would be appropriate." SSR 83-12.

directly apply the rules in appendix 2 unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision").

The following three scenarios exist:

(1) Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate rule in Tables No. 1, 2, or 3 would not be affected.

(2) Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision.

(3) Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a VS[11] will be necessary.

SSR 83-14.

ALJs are advised to consult VEs "where an individual's exertional RFC does not coincide with the full range of sedentary work." SSR 83-12; *see also Landrum v. Astrue*, No. 08-2678-TLW-JRM, 2010 WL 558599, at *7 (D.S.C. Feb. 10, 2010) ("When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional limitation which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the Grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant."), citing *Walker*, 889 F.2d at 49; *Hammond v. Heckler*, 765 F.2d 424, 425–26 (4th Cir. 1985); *Cook v. Chater*, 901 F. Supp. 971 (D.Md. 1995).  A VE "can assess the effect of any

---

[11] "VS" means "vocational specialist," and a VE is a type of VS. *See* SSR 83-12.

limitation on the range of work at issue (e.g., the potential occupational base); advise whether the impaired person's RFC permits him or her to perform substantial numbers of occupations within the range of work at issue; identify jobs which are within the RFC, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country." *Id.*

After assessing Plaintiff's RFC, the ALJ followed the directive of SSR 83-14 and looked first to the medical-vocational guidelines to determine if Plaintiff's RFC precisely met the criteria of any particular rule. After looking to the medical-vocational guidelines and determining that no guideline could be applied directly, the ALJ did not have a clear understanding of the effects of the assessed nonexertional limitations on the job base. Therefore, she solicited the services of a VE for clarification. *See* Tr. at 59–74. In her decision, the ALJ indicated she was relying on the medical-vocational rule for sedentary work based on the VE's testimony that Plaintiff "could perform essentially a full range of sedentary work." *Id.* She concluded that a finding of "not disabled" was directed by medical-vocational rule 201.24.[12] *Id.*

---

[12] The medical-vocational rule cited by the ALJ appears to be in error. Medical-vocational rule 201.24 pertains to individuals with a maximum sustained work capability limited to sedentary work that are younger individuals (age 18–44); have a limited or less education, but are at least literate and able to communicate in English; and have a history of unskilled work or no work history. 20 C.F.R., Pt. 404, Subpt. P, App'x 2, § 201.24. The ALJ's findings regarding Plaintiff's age, education, and PRW are consistent with a determination that Plaintiff was "[n]ot disabled" based on medical-vocational rule 201.21. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 2, § 201.21. The ALJ's citation to medical-vocational rule 201.24 appears to be a typo that amounted to harmless error because she would have reached the same conclusion if she had cited the proper medical-vocational rule. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of Social Security benefits where the ALJ erred in pain evaluation because "he

Plaintiff argues the ALJ erred in relying on the VE's testimony to conclude he was capable of performing substantially all sedentary work because the VE's testimony conflicted with the *DOT*. A review of the record reveals that the ALJ did not consult the *DOT* in assessing Plaintiff's ability to perform work. *See* Tr. at 25. Generally, an ALJ should look to the *DOT* as the primary source in determining whether jobs exist that an individual with a claimant's limitations may perform. 20 C.F.R. § 404.1566(d); *see also* SSR 00-4p ("[W]e rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). However, pursuant to SSR 83-14, reliance on vocational resources, including the *DOT* and VEs, is not required where the claimant's RFC allows for performance of all or substantially all jobs at a given exertional level. *See also Heckler v. Campbell*, 461 U.S. 458, 461 (1983) (explaining that the medical-vocational "guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy"). Upon questioning the VE regarding the specific limitations included in the RFC assessment, the ALJ was assured by the VE that those limitations allowed Plaintiff to perform all or substantially all unskilled, sedentary jobs. Tr. at 64. Thus, the VE's testimony assured the ALJ that the medical-vocational rules could be appropriately used as a framework for decision making

---

would have reached the same result notwithstanding his initial error); *see also Plowden v. Colvin*, No. 1:12-2588, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (noting that the Fourth Circuit has applied the harmless error analysis in the context of Social Security disability determinations).

because the nonexertional limitations did not significantly erode the sedentary, unskilled occupational base.

Plaintiff argues "there are many sedentary occupations . . . that require constant manipulation," but he cites no authority to support his contention. *See* ECF No. 21 at 18. A finding of disability under the medical-vocational rules requires that a claimant be able to perform a full range of work at the given exertional level, and a full range of work is defined as "all or substantially all[13] occupations existing at an exertional level." SSR 83-10. Plaintiff failed to cite particular sedentary, unskilled jobs that were classified by the *DOT* as requiring constant reaching, handling, or fingering. "The regulations take notice of approximately" . . . "200 sedentary occupations." SSR 83-10. Although the ALJ has a duty to resolve apparent unresolved conflicts between VE testimony and the *DOT*, it seems unreasonable that this duty would require the ALJ to review all of the approximately 200 jobs at the sedentary, unskilled level and determine whether "all or substantially all" of them may be performed with a limitation to frequent, but not constant, reaching, handling, or fingering. *See* SSR 00-4p. Pursuant to SSR 83-12, it is appropriate for the VE to assess the effect of any limitation on the potential occupational base. In the absence of specific evidence to show that the limitations set forth in the RFC assessment compromised the full range of work at the sedentary, unskilled level, the

---

[13] "Substantially all activities" means "[n]early all (essentially all) of the activities required in an exertional range of work." SSR 83-10.

undersigned recommends the court find the ALJ reasonably relied on the VE's testimony that Plaintiff could perform all or substantially all jobs at the sedentary, unskilled level.[14]

Although Plaintiff argues that a conflict exists between the ALJ's finding that he could perform a full range of sedentary work and the restriction to occasional lifting and carrying of five to 10 pounds with his right upper extremity, there appears to be no actual conflict. The regulations provide that sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). As an initial matter, an occasional ability to lift and carry five to 10 pounds does not conflict with an ability to lift no more than 10 pounds at a time on an occasional basis. While the limitation in the RFC assessment provides a weight range, the maximum weight limit is consistent in both restrictions. In addition, the ALJ did not include any limitation on Plaintiff's ability to use his left upper extremity for lifting and carrying. Even if there were an appreciable difference between an ability to occasionally lift and carry five to 10 pounds and an ability to occasionally lift no more than 10 pounds at a time, that difference could be compensated for by Plaintiff's ability to use his left upper extremity to assist in lifting. Therefore, the undersigned recommends the court find the ALJ did not err in determining that Plaintiff's

---

[14] Even if Plaintiff had cited particular jobs that could not be performed with the limitations in the assessed RFC, the existence of a few jobs that cannot be performed does not refute the VE's testimony that an individual with the limitations included in the assessed RFC could perform the full range of work at the sedentary, unskilled exertional level. However, specific evidence of a more substantial reduction in the sedentary, unskilled occupation base could reasonably refute the VE's testimony that the individual could perform the full range of work at the sedentary exertional level.

exertional limitations were consistent with those applicable under medical-vocational rule 201.21.

Despite the undersigned's recommendation that the court find no error in the ALJ's determination that medical-vocational rule 201.21 could be applied, the undersigned recommends the court find the ALJ erred in applying the medical-vocational rule mechanically in Plaintiff's borderline age situation. Plaintiff was born on June 11, 1965. Tr. at 25. The ALJ's decision was rendered on February 26, 2015, which meant that Plaintiff was 49 years, eight months, and 15 days old at the time the decision was rendered. Tr. at 25, 26. Under the medical-vocational guidelines, Plaintiff was classified as a "younger individual age 45–49." *See* 20 C.F.R. § 404.1563. Plaintiff was three-and-a-half months shy of his fiftieth birthday, and the same findings regarding maximum sustained work capability, education, and PRW that directed a decision of "[n]ot disabled" at age 49 directed a finding of "[d]isabled" at age 50. *Compare* 20 C.F.R., Pt. 404, Subpt. P, App'x 2, § 201.21, *with* 20 C.F.R., Pt. 404, Subpt. P, App'x 2, § 201.14. In considering the claimant's age, the regulations recognize that "older age is an increasingly adverse vocational factor," and the ages of 45, 50, 55, and 60 may reflect different decisions even though the RFC, education, and past work experience are the same. SSR 83-10. In applying the medical-vocational guidelines, ALJs are not to apply age categories mechanically in borderline situations. *Id.*; *see also* 20 C.F.R. § 404.1563(b) ("We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few

months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."). "It appears that the majority of district courts in the Fourth Circuit find some discussion of the borderline age issue necessary when the claimant is significantly close in age to the higher age category." *Steen v. Colvin*, No. 4:13-3027-BHH, 2016 WL 536743, at *3 (D.S.C. Feb. 11, 2016), citing e.g., *Hofler v. Astrue,* 2013 WL 442118, at *7 (E.D. Va. Jan. 9, 2013) (finding unpersuasive the defendant's argument that lack of vocational adversities and use of VE shows ALJ properly applied the grids where VE found skills nontransferable); *Harris v. Astrue*, No. 1:11-2442-TMC-SVH, 2012 WL 6761333, at *12–14 (D.S.C. Dec. 5, 2012), aff'd, 2013 WL 30140 (D.S.C. Jan. 3, 2013) (remanding where the ALJ "should have decided whether it was more appropriate to use the higher age category," but "[s]uch an analysis is absent from the record"); *Pickett v. Astrue*, 895 F. Supp. 2d 720, 725 (E.D. Va. 2012) (remanding because "[t]he greater weight of authority leads to the conclusion that the ALJ's failure to expressly address the borderline age issue provides insufficient basis for review" where claimant was less than four months away from the higher age category); *Brown v. Astrue*, No. 3:07-2914-SB, 2009 WL 890116, at *12 (D.S.C. Mar. 30, 2009) (remanding where the ALJ failed to offer any analysis for applying the claimant's chronological age when claimant was four months shy of the higher age category); *Bush v. Astrue*, 2008 WL 867941, at *7–8 (S.D.W. Va. Mar. 28, 2008) (finding the Commissioner's decision was not supported by substantial evidence where the ALJ failed to explain his choice of age category when claimant was

116 days from a higher age category). Here, the ALJ's decision was rendered less than four months before Plaintiff's fiftieth birthday, but the ALJ did not recognize Plaintiff's borderline age. *See* Tr. at 25. Her decision is devoid of explanation of her reliance on Plaintiff's chronological age to apply the medical-vocational guidelines, and it appears that she applied them mechanically, contrary to the directives of 20 C.F.R. § 404.1563(b) and SSR 83-10. In light of this error, the undersigned recommends the case be remanded for consideration of Plaintiff's borderline age.[15]

2.    Explanation of RFC Finding

Plaintiff argues the ALJ did not explain her RFC assessment in accordance with the provisions of SSR 96-8p. [ECF No. 21 at 21]. The Commissioner argues the RFC assessed by the ALJ reflects her consideration of Plaintiff's credibly-established functional limitations. [ECF No. 23 at 11].

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant

---

[15] It is possible on remand that the ALJ may apply neither medical vocational rule 201.14 nor medical vocational rule 201.21. The ALJ found that Plaintiff could perform a reduced range of light work. *See* Tr. at 21–22. If, upon remand, the ALJ obtains vocational evidence to indicate Plaintiff's RFC would allow for the performance of specific jobs that exist in significant numbers at the light exertional level, Plaintiff's borderline age situation would not direct a finding of "[d]isabled" at age 50. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 2, § 202.14.

evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In view of this authority, the undersigned considers Plaintiff's specific allegations of error with regard to the assessed RFC.

### a.    Ability to Perform Light Work

Plaintiff argues the ALJ erred in failing to reconcile her determination that he could perform light work with the restriction on lifting indicated in the assessed RFC. [ECF No. 21 at 22]. The Commissioner maintains that substantial evidence supports the ALJ's finding that Plaintiff retained the RFC to perform light work with the additional assessed functional limitations. [ECF No. 23 at 10].

The regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a

good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The ALJ found that Plaintiff was capable of performing light work, but that he could only occasionally lift and carry five to 10 pounds with his right upper extremity and had several additional nonexertional limitations. Tr. at 21–22. She explained her determination as follows:

Consistent with the objective signs and findings that the claimant has no difficulty with standing and walking but does have lifting limitations, the residual functional capacity limits the claimant to light exertional work with the above limitations on lifting and carrying and postural, manipulative and environmental limitations to accommodate any limitations the claimant's status post-rotator cuff repair of the right shoulder, status post-rotator cuff repair revision, cervical spondylosis, and obesity may cause.

Tr. at 24. She subsequently determined, based on the VE's testimony, that Plaintiff could perform a full range of sedentary work. Tr. at 25.

The undersigned recommends the court find the ALJ adequately explained and reconciled her determination that Plaintiff's RFC limited him to light work, but that he could perform a full range of sedentary work. The definition of light work specifies that jobs may be classified as light if they require considerable standing and walking, but very little lifting. *See* 20 C.F.R. § 404.1567(b). The ALJ explained that she was limiting Plaintiff to light work because he had no difficulty with standing and walking. *See* Tr. at 24. She determined Plaintiff was not capable of performing the full range of light work

because she acknowledged that his reduced ability to lift with his right upper extremity decreased the number of jobs he could perform at the light exertional level. *See id.* However, in light of the assessed right upper extremity lifting restriction and the presumption that an individual who can perform light work is also capable of performing sedentary work, the ALJ reasonably relied on the VE's opinion that Plaintiff was capable of performing a full range of sedentary work. *See* Tr. at 25.

b.    Functional Abilities From January 2011 through June 2012

Plaintiff argues the ALJ did not properly consider his ability to perform the activities required in the assessed RFC from January 2011 through June 2012. [ECF No. 21 at 23–24]. The Commissioner argues that Plaintiff had relatively mild physical examination findings post-surgery and that his complaints were inconsistent with his physicians' findings. [ECF No. 23 at 11–12].

To be considered "disabling," an impairment must have lasted or be expected to last for a period of 12 months or more at a level that prevents the performance of past work and any other substantial gainful work in the national economy. *See* 20 C.F.R. § 404.1405(a).

The ALJ acknowledged Plaintiff's injury in January 2011, the MRI results from February 2011, his surgery in March 2011, the MRI arthrogram results in August 2011, the second surgery in September 2011, the MRI in January 2012, and the third surgery in February 2012. Tr. at 23. However, she found that Plaintiff's functional abilities had significantly improved in his right upper extremity by July 2012. *See* Tr. at 23, citing Tr. at 293.

The undersigned recommends the court find the ALJ did not adequately consider Plaintiff's ability to use his right upper extremity during the period from January 2011 until June 2012. It appears the ALJ based her RFC assessment on Plaintiff's functioning after July 2012, but failed to account for Plaintiff's ability to use his right upper extremity during the period of approximately a year-and-a-half when the record demonstrated that he underwent three surgical procedures and endured a prolonged recovery period from at least the last surgery. *See* Tr. at 23–24. Orthopedic treatment records for the period following Plaintiff's two surgeries are absent from the record, but progress notes following the third surgery show that Dr. Singer and Mr. Raspa instructed Plaintiff to wear a sling on his right arm and to use the arm for nothing other than physical therapy exercises from February 2012 through June 2012. *See* Tr. at 295, 302, 304. The period from Plaintiff's initial injury until his improvement in July 2012 was over a year, and it could have been considered as a period of disability even if Plaintiff had improved to the point of returning to work in July 2012.[16] Because the ALJ neglected to consider Plaintiff's functional abilities from January 2011 through June 2012, she did not adequately considered his ability to perform work-related activities on a regular and continuing basis in accordance with SSR 96-8p.

---

[16] The record is incomplete in that it lacks post-surgical records from Dr. Singer and any other orthopedic providers for the period from February through December 2011. It is certainly possible that the addition of these records may show significant functional improvement in Plaintiff's right upper extremity functioning between surgeries. If this is the case, the ALJ could reasonably conclude that Plaintiff was not disabled between January 2011 and June 2012.

c.    Dr. Singer's Opinion

On September 27, 2012, Dr. Singer authorized Plaintiff to return to work that required he not lift over 25 pounds or engage in repetitive overhead work. Tr. at 288. On July 28, 2014, Dr. Singer wrote the following: "Permanent restrictions would include limited use of the right arm with no repetitive overhead activities, no lifting more than 5–10# occasionally with right arm at side. No significant pushing or pulling recommended." Tr. at 409.

Plaintiff argues the ALJ did not adequately consider Dr. Singer's opinion in assessing his RFC. [ECF No. 21 at 25–26]. The Commissioner contends that Dr. Singer did not opine that Plaintiff could not work and that the assessed RFC was supported by substantial evidence. [ECF No. 23 at 12].

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the assessed RFC conflicts with a medical source's opinion, the ALJ must explain why the medical source's opinion was not adopted. *Id.* Medical opinions from treating sources may be entitled to controlling weight if they are supported by medically-acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. However, even if an ALJ determines that the treating source's opinion is not entitled to controlling weight, she must still consider the following factors in analyzing the opinion: (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the

nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

The ALJ cited Dr. Singer's statements from September 2012 and July 2014 and indicated she gave both opinions great weight, but accorded the greatest weight to the July 2014 opinion. Tr. at 24. Pertinent to Plaintiff's argument, the assessed RFC included abilities to occasionally lift and carry five to 10 pounds with the right upper extremity; reach overhead occasionally with the right upper extremity, and reach, handle, and finger frequently with the right upper extremity. Tr. at 21–22. The ALJ stated she weighed Dr. Singer's opinion based on his status as Plaintiff's treating orthopedist, his longitudinal treatment of Plaintiff's shoulder condition, and his opinions' consistency with Plaintiff's documented shoulder problems. Tr. at 25.

The undersigned recommends the court find the ALJ did not adequately explain in the RFC assessment how she considered some of the limitations identified by Dr. Singer. The ALJ did not specifically indicate she accorded controlling weight to Dr. Singer's July 2014 opinion, but she cited several of the factors in 20 C.F.R. § 404.1527(c) that weighed in favor of the opinion. Despite the fact that she purported to give it the greatest weight, she neglected to include in the assessed RFC limitations with regard to Plaintiff's abilities to push and pull. *Compare* Tr. at 21–22, 24, *with* Tr. at 409 ("No significant pushing or pulling recommended."). She also failed to address Dr. Singer's indication that Plaintiff could only lift five to 10 pounds with his right arm at his side. *Compare* Tr. at 21–22,

with Tr. at 409 ("no lifting more than 5–10# occasionally with right arm at side"). Based on the undersigned's lay interpretation, this restriction would presumably preclude Plaintiff from engaging in any overhead lifting. Because the ALJ neglected to either include all of the limitations assessed by Dr. Singer in the RFC or to explain her reasons for excluding some limitations, the undersigned recommends the court find she did not adequately consider Dr. Singer's medical source opinion in accordance with the provisions of SSR 96-8p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

April 19, 2016                                        Shiva V. Hodges
Columbia, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

39

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).